Saw Plastic, LLC v. Sturrus, 2017 NCBC 75.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 16 CVS 10068 |

SAW PLASTIC, LLC and STEVE A.
WORDSWORTH,

        Plaintiffs,

v.

ANTHONY STURRUS, GALLATIN
EQUITY PARTNERS, LP,
GALLATIN EQUITY PARTNERS,
GP, LLC, JULIAN ALEXANDER,
and AIMET TECHNOLOGIES, LLC
f/k/a AIMET ACQUISITION, LLC,

        Defendants.

**OPINION AND ORDER
ON DEFENDANTS' MOTION
TO DISMISS**

THIS MATTER comes before the Court on Defendants Anthony Sturrus, Gallatin Equity Partners, LP, Gallatin Equity Partners GP, LLC, Julian Alexander, and Aimet Technologies, LLC's Motion to Dismiss ("Motion to Dismiss").[1]

THE COURT, having considered the Motion to Dismiss, the briefs in support of and in opposition to the Motion to Dismiss, the arguments of counsel at the hearing, and other appropriate matters of record, concludes that the Motion to Dismiss should be DENIED for the reasons set forth below.

> *Ward and Smith, P.A. by Michael J. Parrish, Esq., Gary J. Rickner, Esq.,
> for Plaintiffs Saw Plastic, LLC and Steve A. Wordsworth.*
>
> *Stark Law Group, PLLC by Thomas H. Stark, Esq., Seth A. Neyhart,
> Esq., Brycen Williams, Esq. for Defendants Gallatin Equity Partners,
> L.P., Gallatin Equity Partners, GP, LLC, Julian Alexander, and Aimet
> Technologies, LLC.*

---

[1] On August 3, 2017, the Court issued an Order on Motion for Sanctions in which it struck the Motion to Dismiss to the extent it was made on behalf of Defendant Anthony Sturrus ("Sturrus") and entered default against Sturrus. Accordingly, Gallatin Equity Partners, LP, Gallatin Equity Partners GP, LLC, Julian Alexander, and Aimet Technologies, LLC are referred to hereinafter as "Defendants."

*Anthony Sturrus, pro se.*

McGuire, Judge.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

1.     The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6), but only recites those facts included in the complaint that are relevant to the Court's determination of the Motion. *See e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.,* 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

2.     Saw Plastic, LLC ("SAW") is a North Carolina limited liability company. Steve A. Wordsworth ("Wordsworth") is a member and manager of SAW (collectively, SAW and Wordsworth are referred to as "Plaintiffs").

3.     Gallatin Equity Partners, LP ("Gallatin LP") is a Delaware limited partnership. Gallatin Equity Partners GP, LLC ("Gallatin GP") is a Delaware limited liability company (Ver. Compl. ¶¶ 5–6.) (collectively, Gallatin LP and Gallatin GP are referred to as "Gallatin.")[2] Gallatin GP, Sturrus, and Julian Alexander ("Alexander") are partners in Gallatin LP and members and managers of Gallatin GP (Ver. Compl. ¶¶ 15–18.)

4.     Aimet Technologies, LLC ("Aimet"), a Delaware limited liability company with its principal place of business in Wake County, North Carolina, was formed in 2014 and is formally known as Aimet Acquisition, LLC (Ver. Compl. ¶ 8—12.). Aimet is in the business of custom injection molding for plastic products and

---

[2] There is some dispute as to which Gallatin entity is the appropriate Defendant in this action. However, this issue is not currently before the Court in its determination of the Motion to Dismiss.

related services. At all relevant times, Defendant Sturrus was an officer, director, president, member, Chair of the Board of Managers, and Chief Executive Officer of Aimet. (Ver. Compl. ¶¶ 13–16.)

5.     In October 2014 Sturrus began to solicit Wordsworth and SAW to purchase debt securities in Aimet by touting "Aimet's business prospects and his optimistic vision for Aimet." (Ver. Compl. ¶¶ 28–30.) At all times when soliciting Wordsworth and SAW, Sturrus "was acting as both an officer and director of Aimet and also a partner, manager, and owner of Gallatin." (Ver. Compl. ¶¶ 37–38.)

6.     Sturrus purchased debt securities from Aimet in December 2014, and February, March, and April, 2015. SAW later converted part of the debt securities into equity securities in Aimet. (Ver. Compl. ¶ 34.) On February 13, 2015, Wordsworth and Aimet executed a Loan Agreement and Promissory Note, in the original principal amount of $1,000,000.00. (Ver. Compl. ¶ 35; Defs.' Mot. Dismiss, Exs. A, D, hereinafter "February 2015 Note.") Aimet also executed a Security Agreement giving Wordsworth a security interest in certain of Aimet's assets. (Ver. Compl. ¶ 36; Defs.' Mot. Dismiss, Ex. E.)

7.     During late 2014 and early 2015, Sturrus also proposed that SAW and Gallatin make equal equity investments in Aimet in exchange for equal ownership and rights in Aimet. (Ver. Compl. ¶¶ 40–43.) Sturrus provided SAW with proposed capital tables that showed that Gallatin and SAW would make equal cash contributions to Aimet. (Ver. Compl. ¶¶ 43–44.) Sturrus indicated that it was Gallatin's intent to invest in Aimet before, or contemporaneously with, its receipt of

its ownership interest and voting rights in Aimet and on equal terms with SAW's investment. (Ver. Compl. ¶¶ 45—48.) Sturrus told Wordsworth and SAW that Gallatin's contribution would be funded one-half by Sturrus and one-half by Alexander. (Ver. Compl. ¶ 41.)

8. On or about April 1, 2015, the initial members of Aimet executed the Operating Agreement of Aimet Acquisition, LLC. (Ver. Compl. Ex. A, hereinafter, "Operating Agreement.") Schedule A to the Operating Agreement contains a table titled "Members, Initial Capital and Membership Interests" ("Capital Table"). The Capital Table provided that SAW and Gallatin would each provide a capital contribution of $375,000.00 in exchange for 375,000 Class A Units, a 37.152% voting interest in Aimet, and a 35.294% membership interest in Aimet. (Operating Agreement, Schedule A.) The Capital Table indicated that SAW and Gallatin were to make a "cash contribution." The Capital Table also provided that the other members of Aimet would make their respective capital contributions through a combination of cash and a promissory note, or through non-cash contributions made to Aimet. (Ver. Compl. ¶ 58; Operating Agreement, Schedule A.)

9. SAW made its full $375,000.00 contribution to Aimet. (Ver. Compl. ¶ 66.)

10. Gallatin did not make its full cash contribution, and "paid substantially less than $375,000.00" because "while Alexander funded certain amounts of the purchase price for Gallatin's equity securities in Aimet, Sturrus did not fund or did not fully fund his share of the purchase price." (Ver. Compl. ¶¶ 59–60.) Despite not

making its full contribution, Gallatin received its 37.152% voting interest and 35.294% membership interest in Aimet. (Ver. Compl. ¶ 59.)

11.    Plaintiffs allege that Sturrus's representations that Gallatin would make a capital contribution to Aimet of $375,000 were false and misleading and were made to induce SAW to purchase its membership interest in Aimet. (Ver. Compl. ¶ 67.) Plaintiffs further allege:

> Had SAW known that its investment in Aimet would not be on equal terms with Gallatin; that Gallatin would not immediately pay for its equity securities; or that Aimet or Sturrus would convey to Gallatin its equity securities without receiving Gallatin's full payment, SAW would not have purchased equity securities from Aimet or would have required different pricing, terms, or conditions for any purchase of equity securities . . . .

(Ver. Compl. ¶ 73.)

12.    On or about September 29, 2015, while soliciting Wordsworth for additional capital for Aimet, Sturrus disclosed that Gallatin had not fully paid its capital contribution. Nevertheless, Sturrus also "expressly represented" that Gallatin would make its full capital contribution in Aimet on or before October 31, 2015. (Ver. Compl. ¶¶ 79, 81.) In reliance on this representation, Wordsworth agreed to enter into an Amended and Restated Loan Agreement, Promissory Note, and Security Agreement with Aimet for the maximum principal amount of $1,550,000.00. (Ver. Compl. ¶ 82; Defs.' Mot. Dismiss, Exs. B, F, G, collectively the "Amended Note"). The Amended Note replaced the February 2015 Note. The Amended Note had a maturity date of December 31, 2017, and provided for Aimet to pay monthly interest on borrowed amounts equal to the prime rate established by Providence Bank plus 5%,

but not to exceed 9.5%. (Defs.' Mot. Dismiss, Ex. F.) The Amended Note gave Wordsworth a security interest in, *inter alia*, Aimet's accounts receivable, inventory, and fixtures and equipment. (Defs.' Mot. Dismiss, Ex. F.)

13.     Wordsworth would not have executed the Amended Note "but for the assurances and representations by Sturrus that Gallatin would pay its obligations to Aimet by October 31, 2015." (Ver. Compl. ¶ 84.)

14.     In January 2016, Aimet defaulted on the Amended Note. (Ver. Compl. ¶ 85.)

15.     Sturrus continued to solicit Wordsworth for additional capital in early 2016. On February 19, 2016, Sturrus asked Wordsworth to make a personal loan to Sturrus so that he could provide Aimet with "much needed cash." (Ver. Compl. ¶¶ 87–88.) Later that same day, Wordsworth was informed that Aimet's bank account would be overdrawn unless substantial funds were received immediately. (Ver. Compl. ¶ 90.) In addition, on February 19, 2016, Sturrus and Aimet revealed to Wordsworth that Gallatin still had not paid the full $375,000.00 capital contribution to Aimet. (Ver. Compl. ¶ 91.) Wordsworth declined to make the personal loan to Sturrus, and instead executed a Due on Demand Promissory Note to Aimet, dated February 19, 2016 in the amount of $75,000.00. (Ver. Compl. ¶¶ 92–94; Defs.' Mot. Dismiss, Ex. C, the "Demand Note"; collectively the Amended Note and Demand Note are referred to hereinafter as "the Notes"). The Demand Note provided for Aimet to pay simple interest of 8% on the borrowed amount, but 15% interest upon a default.

16.     Wordsworth made demand for payment of the Demand Note, but Aimet failed to pay the note. (Ver. Compl. ¶ 96.)

17.     On August 10, 2016, Plaintiffs initiated this lawsuit by filing the Verified Complaint. On September 15, 2016, this case was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of Chief Judge James L. Gale on September 16, 2016.

18.     The Verified Complaint asserts claims against Sturrus, Aimet, and Gallatin for violations of the North Carolina Securities Act, G.S. § 78A-56(a) and (c) ("NCSA"), common law fraud, and unlawful solicitation of unregistered securities under G.S. § 78A-24.[3] The Verified Complaint also asserts claims for vicarious liability against Gallatin and Aimet and partnership liability against Sturrus, Alexander, and Gallatin GP.[4]

---

[3] The NCSA applies "to persons who sell or offer to sell [securities] when (i) an offer to sell is made in this State, or (ii) an offer to buy is made or accepted in this State." G.S § 78A-63(a). Although Plaintiffs have not alleged that the offers or acceptances of the transactions at issue occurred in North Carolina, Defendants do not contest the NCSA would apply if the transactions involve securities.

[4] The Verified Complaint contains two separate claims labeled "Third Claim for Relief" (¶¶ 133–34, titled "Fraud—Sturrus, Gallatin, Aimet," and ¶¶ 135–42, titled "Unlawful Sale of Solicitation of Unregistered Securities"), and two separate claims labeled "Fourth Claim for Relief" (¶¶ 143–51, titled "Vicarious Liability—Gallatin, Aimet," and ¶¶ 152–54, titled "Partnership Liability—Sturrus, Alexander, Gallatin Equity Partners GP, LLC"). Accordingly, where appropriate, the Court will refer to the claims by reference to the paragraph numbers in the Verified Complaint alleging the claim.

19. On October 11, 2016, Defendants filed the Motion to Dismiss, and on October 31, 2016, Plaintiffs responded in opposition to the Motion to Dismiss.

20. The Court subsequently stayed this case until February 7, 2017. Following the stay, new counsel appeared on behalf of Defendants, except Sturrus. Sturrus opted to proceed pro se in this matter.

21. On May 8, 2017, Defendants' new counsel filed a reply in support of the Motion to Dismiss. Sturrus did not file a reply brief.

22. The Motion to Dismiss is fully briefed, the Court held a hearing on the Motion to Dismiss, and it is now ripe for disposition.

## ANALYSIS

### I. 12(b)(6) Standard

23. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). Our appellate courts frequently reaffirm that North Carolina is a notice pleading state. *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the res judicata, and to show the type of case brought." *Id.*

24. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face that absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted). The Court construes the complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).

25. The Court may consider documents which are the subject of plaintiff's complaint and to which the complaint specifically refers, including the contract that forms the subject matter of the action. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

26. Plaintiffs allege that Sturrus, acting as an agent of Gallatin and Aimet, induced Plaintiffs to invest in Aimet through SAW's capital contribution to Aimet and the Notes. Plaintiffs contend Sturrus induced the investments by falsely representing that Gallatin intended to make the same $375,000.00 cash contribution to Aimet that

SAW made, and by failing to tell Plaintiffs that Gallatin had not made the full contribution but had received the benefits of ownership in Aimet. Plaintiffs allege that SAW's capital contribution and the Notes are "securities" under the NCSA, and that Sturrus's misrepresentations and omissions constitute securities fraud under G.S. § 78A-56, and common law fraud. (Ver. Compl. ¶¶ 102–134.) Plaintiffs also allege that Sturrus, Gallatin, and Aimet unlawfully failed to register the investments they were seeking in Aimet as a security under the NCSA. (Ver. Compl. ¶¶ 135–142.) Finally, Plaintiffs allege that Gallatin and Aimet are vicariously liable for Sturrus's conduct and that Alexander and Gallatin GP are liable as partners for Sturrus's conduct. (Ver. Compl. ¶¶ 143–154.)

27. Defendants first move to dismiss the claims under G.S. § 78A-56 and for failure to register securities on the grounds that SAW's capital contribution to Aimet and the Notes are not securities under the NCSA.

A. *Saw Plastic's Capital Contribution and Membership Interest in Aimet*

28. The NCSA is a state-law scheme which is complementary to federal securities law schemes. *Piazza v. Kirkbride*, 785 S.E.2d 695, 707, 2016 N.C. App. LEXIS 371, *34 (Apr. 5, 2016), *cert. granted*, 794 S.E.2d 316, 2016 N.C. LEXIS 664 (Aug. 18, 2016). "[T]he NCSA parallels federal antifraud acts," such that North Carolina Courts "use federal courts' interpretation of analogous federal actions as persuasive authority." *Id.* at 708, 2016 N.C. App. LEXIS 371 at *35. (*citing State v. Davidson*, 131 N.C. App. 276, 282–83, 506 S.E.2d 743, 748 (1998)). "[T]his Court previously has found guidance in interpreting the NCSA's definition of 'security' in

decisions interpreting the strikingly similar federal definition of "security" found in the Securities Exchange Act of 1934." *Vestlyn BMP, LLC v. Balsam Mt. Grp., LLC*, 2016 NCBC LEXIS 48, *31 (N.C. Super. Ct. June 22, 2016). In making this determination, courts "are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

29. Defendants argue that Plaintiffs' capital contribution to, and resulting membership interest in, Aimet is not a security. The NCSA defines a "security," in relevant part, as

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit sharing agreement . . . investment contract . . . or, in general any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

G.S. § 78A-2(11).

30. Defendants contend that the membership interest in Aimet must be analyzed as an "investment contract" after applying the test developed in *SEC v. W.J. Howey*, 328 U.S. 293, 298–99 (1946). (Defs.' Mem. Supp. Mot. Dismiss 13–15.) In *Howey*, the United States Supreme Court held that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." *Id*. at 298–99. This Court has held "[t]he *Howey* definition encompasses four elements: "(1) an investment of money,

(2) in a common enterprise, (3) an expectation of profits, and (4) the expectation that profits will arise solely from the efforts of the promoter or a third party." *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship.,* 2013 NCBC LEXIS 11, \*25 (N.C. Super. Ct. Feb. 19, 2013).

31.     Defendants concede that "[w]ith respect to SAW's Membership and Capital Contribution in Aimet, Plaintiffs have alleged the first three factors of the *Howey* test." (Defs.' Mem. Supp. Mot. Dismiss 13.) Defendants, however, contend that Plaintiffs have failed to allege facts showing an expectation that profits in Aimet will arise "solely" from the efforts of Sturrus and Gallatin. Because SAW is one of the largest owners of Aimet, controls two of the six seats on Aimet's Board of Managers, and manages Aimet through its representatives on Aimet's Board of Managers, Defendants contend SAW exercises meaningful control over Aimet's business, and therefore cannot allege that it expected profits to arise solely from the efforts of Sturrus and Gallatin. (Defs.' Mem. Supp. Mot. Dismiss 14 (citing Operating Agreement §4.2).)

32.     Plaintiffs argue that the *Howey* test is not applicable here because North Carolina law controls, and regulations adopted under the NCSA provide both a broader definition of "investment contract" than *Howey* and a rebuttable presumption that a membership interest in a limited liability company is a security under the NCSA.  (Pls.' Mem. Opp. Defs.' Mot. Dismiss 9—11 (citing 18 NCAC 06A.1104(8), 18 NCAC 06A.1510).) Under 18 NCAC 06A.1104(8) the definition of an investment contract includes the following:

(a) Any investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor. In this Subparagraph a "common enterprise" means an enterprise in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of a third party[.]

33.     Section 6A.1510 provides in relevant part as follows:

(a) Membership interest . . . in a limited liability company shall be presumed to be securities within the meaning of G.S. 78A-2(11) in either of the following circumstances: (1) where the articles of organization of the limited liability company provide that all members of the limited liability company are not necessarily managers by virtue of their status as members; or (2) where all members by virtue of their status as members are managers of the limited liability company and the number of members is greater than 15.
(b) Among the factors that will be considered . . . as evidence offered to rebut or support the presumption in Paragraph (a) of this Rule are: (1) whether investors retain, under the limited liability company's operating agreement, the right to exercise practical and actual control over the managerial decisions of the enterprise . . . .

34.     Plaintiffs contend that they are entitled to the presumption created by this rule because SAW is a member, but not a manager, of Aimet. Plaintiffs argue that Defendants must show that SAW had "practical and actual control" over Aimet in order to rebut the presumption that the membership interest is a security. (Pls.' Mem. Opp. Defs.' Mot. Dismiss 10.) The Operating Agreement provides that a Board of Managers consisting of six (6) members "shall direct, manage, and control the business of the Company to the best of its ability and shall have full and complete authority, power, and discretion" subject to certain Member rights, "to make any and

all decisions, and to do any and all things which the Board of Managers deems necessary or desirable for that purpose." (Operating Agreement § 4.1(a).) The Board of Managers makes decisions by majority vote. (Operating Agreement § 4.1(b).) Saw Plastic elected two members to the Board of Managers, including Wordsworth. Plaintiffs contend that even if SAW controls two members of the Board of Managers, it has only a minority voting interest and is not able to control Aimet's business decisions. (Pls.' Mem. Opp. Defs.' Mot. Dismiss 14.) Finally, Plaintiffs expressly allege that "neither SAW nor Wordsworth is actively engaged, on a regular basis, in the management of Aimet's business." (Ver. Compl. ¶ 138.)

35. The Court concludes that Plaintiffs have alleged facts that would support a claim that SAW's capital contribution to Aimet was an "investment contract" within the meaning of the NCSA, and that the membership interest in Aimet was a security. Aimet was a "common enterprise" between SAW, Gallatin, and the other members. SAW's fortunes in Aimet were interwoven with the efforts of Sturrus on behalf of Aimet since Sturrus was Aimet's CEO and President. It also is clear from the allegations that Sturrus was the primary principal behind Aimet's operations. Plaintiffs allege that SAW invested in Aimet, based at least in part, on Sturrus's optimistic business projections for Aimet's future profitability. The Operating Agreement anticipated a distribution of profits from Aimet's operations. (Operating Agreement §§ 10.1–10.9.)

36. In addition, neither the allegations in the Verified Complaint nor the terms of the Operating Agreement establish that SAW or its representatives had

actual control over the managerial decisions of Aimet. "[C]ontrol must be actual rather than theoretical, and must take economic realities into consideration." *NNN Durham Office Portfolio 1 LLC*, 2016 NCBC LEXIS 95 at *50. Restricting its consideration to the pleadings and the documents properly considered, the Court cannot say at this stage of the litigation that SAW's membership interest in Aimet is not a security subject to the NCSA. Accordingly, Defendants' motion to dismiss Plaintiffs' claims under G.S. §78A-56 and Plaintiffs' claim for unlawful solicitation of unregistered securities in violation of the NCSA on the grounds that the membership interest in Aimet is not a security should be DENIED.[5]

B.      *The Amended Note and Demand Note*

37.      Defendants next argue the Notes are not securities under the NCSA. Both parties agree that determination of whether the Notes are securities requires application of the United States Supreme Court's holding in *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990). In *Reves*, the Supreme Court rejected application of the *Howey* test to the determination of whether a note is a security under the Securities Exchange Act. 494 U.S. 56 at 64. Instead, the Court adopted the "family resemblance" test used by the Second Circuit Court of Appeals. *Id*. at 64–65 (citing *Exchange Nat. Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137–38 (2nd Cir. 1976)).

---

[5] Plaintiffs also argue that the membership interest in Aimet is a security under the NCSA because Aimet is a "Direct Participation Program" under the definition in 18 NCAC 06A.1104(3), and that the membership interest meets the standard for a security under the *Howey* test. (Defs.' Mem. Supp. Mot. Dismiss 11, 13–14.) Since the Court concludes that Plaintiffs sufficiently alleged that the membership interest in Aimet is a security for other reasons, it need not address these arguments.

38.     Since the statutory definition of security under the Security Exchange Act includes "any note," the family resemblance test starts "with a presumption that every note is a security." *Id.* at 65.   That presumption, however, is rebuttable. If the note bears a resemblance to certain types of financial instruments that are recognized not to be securities, then the note is not a security. *Id.*  Included among notes that are not securities are "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business[.]" *Id.* (quoting *Exchange Nat. Bank of Chicago*, 544 F.2d at 1138.)

39.     In *Reves*, the Court held that in order to determine whether a particular note bears a family resemblance to those notes that are not securities, courts should engage in a four factor analysis of: (1) the motivations that would prompt a reasonable seller and buyer to enter into the note; (2) the "plan of distribution" of the note, to determine whether it is an instrument in which there is 'common trading for speculation or investment'"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." 494 U.S. at 66–67 (citations omitted). Here, Defendants and Plaintiffs both argue that application of these four factors supports their respective positions.

40.     Defendants do not squarely frame their argument with regard to each of the four *Reves* factors, but instead argue that the Notes strongly resemble notes that are recognized as not being securities, such as short-term notes secured by a lien on a small business or its assets or accounts receivable. (Defs.' Mem. Supp. Mot. Dismiss 15–17.) Defendants contend that the Notes are "short term,"[6] and the Amended Note is secured by Aimet's assets, including its accounts receivable. The Notes were extended to assist Aimet with is business expenses and cash flow problems. (Defs.' Mem. Supp. Mot. Dismiss 16.); *Reves*, 494 U.S. 56 at 66. ("If the note is exchanged to . . . correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose . . . the note is less sensibly described as a 'security.'"). Defendants also argue that the Notes are not like an investment in a security because "Wordsworth's entitlement to interest [on the Notes] is an economic expectation that is independent from Aimet's profits, or lack thereof." (Defs.' Mem. Supp. Mot. Dismiss 16.) Finally, Defendants contend that Plaintiffs have not alleged that Sturrus had a "plan of distribution" for the Notes because Plaintiffs do not allege that the Notes were offered to the public and were traded.  (Defs.' Reply 7–8.) Rather, Plaintiffs allege only that "Sturrus made targeted solicitations for Wordsworth or SAW to purchase debt securities and equity securities from Aimet." (Ver. Compl. ¶ 30.)

41.     Plaintiffs expressly address the *Reves* factors. Plaintiffs argue that the first factor, the motivations of the buyer and seller, favors the position that the Notes

---

[6] Defendants' argument that since the demand note is for a term of less than nine months it cannot be a security was expressly rejected by the Court in *Reves*. 494 U.S. at 70–73.

are securities because Wordsworth executed the Notes "in response to Sturrus' requests to raise additional capital for Aimet." (Pls.' Mem. Opp. Defs.' Mot. Dismiss 18 (citing Ver. Compl. ¶¶ 75, 77, 86–88, 93).) "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66. Plaintiffs also contend that the advantageous interest rates on the Notes demonstrate Wordsworth's profit motive in extending the loans to Aimet. *SEC v. Thompson*, 732 F.3d 1151, 1162 (10th Cir. 2013) ("attractive interest rate . . . provides strong evidence that holders were interested primarily in . . . profit"); *Stoiber v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998) ("a favorable interest rate indicates that profit was the primary goal of the lender.")

42. With respect to the second factor, Plaintiffs do not contend that they have alleged that Sturrus had a plan of distribution for the Notes beyond soliciting Wordsworth.

43. Plaintiffs contend that the Notes satisfy the third *Reves* factor because "[t]he investing public would view substantial infusions of money by an individual (Wordsworth) to an entity in its infancy to assist with working capital at a premium rate of interest as an investment, rather than as a typical commercial loan transaction." (Pls.' Mem. Opp. Defs.' Mot. Dismiss 19.)

44. Plaintiffs argue that the fourth factor supports the conclusion that the Notes are securities because no specific statutory scheme exists that reduces the risk associated with the Notes, but do not address the fact that the Amended Note is

protected by a security lien on Aimet's assets. (Pls.' Mem. Opp. Defs.' Mot. Dismiss 19.)

45.     Given the broad protective purposes of the NCSA, and mindful that Plaintiffs are required only to provide "notice of the transactions or occurrences . . . intended to be proved," the Court concludes that the allegations in the Verified Complaint are minimally  sufficient to support the claim that the Notes are securities for purposes of surviving Defendants' motion to dismiss. G.S. §1A-1, Rule 8(a)(1); *Sutton v. Duke*, 176 S.E.2d 161, 165, 277 N.C. 94, 102 (1970) ("Under the 'notice theory of pleading' a statement of claim is adequate if it gives sufficient notice of the claim asserted 'to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of *res judicata*, and to show the type of case brought. . . .'"). The Verified Complaint alleges that Aimet was seeking "investments," and that Sturrus solicited the investments by providing Wordsworth with optimistic business forecasts for Aimet, and "encouraged Wordsworth or SAW to convert any debt securities . . . into equity securities at a future date." (Ver. Compl. ¶¶ 29—33.) Plaintiffs also allege that Wordsworth "only purchased the Debt Securities to protect SAW's equity interest in Aimet." (Ver. Compl. ¶ 111.) Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims under G.S. §78A-56 and Plaintiffs' claim for unlawful solicitation of unregistered securities in violation of the NCSA on the grounds that the Notes are not securities should be DENIED.

46.     Defendants also argue that Wordsworth must elect his remedy and cannot seek damages under the NCSA in this lawsuit because he obtained a judgment

on the promissory notes in a separate action. The Court believes this argument is untimely. Election of remedies is an affirmative defense which must be pleaded by defendants who bear the burden of proof. Accordingly, this doctrine is "not an appropriate basis for dismissal upon a Rule 12(b)(6) motion, since defendants have not yet filed an answer and asserted any defenses." *Tucker v. Fayetteville State Univ.*, No. COA10-726, 2011 N.C. App. LEXIS 613, *4–5 (Apr. 5, 2011).

C.    *Unlawful Sale or Solicitation of Unregistered Securities*

47.    As a separate cause of action, Plaintiffs allege that Defendants violated G.S. § 78A-24, which provides that "[i]t is unlawful for any person to offer or sell any security . . . unless (i) it is registered under this Chapter, (ii) the security or transaction is exempted [under this Chapter], or (iii) it is a security covered under federal law. (Ver. Compl. ¶¶ 135–42.) Plaintiff alleges that SAW's capital contribution and membership in Aimet and the Notes "were required to have been registered by Chapter 78A (Section 78A-24) of the North Carolina General Statutes and by Federal law, but were not registered [or exempted]." (Ver. Compl. ¶¶ 136–37.)

48.    Since the Court concludes that Plaintiffs have sufficiently alleged that the capital contribution to Aimet and the Notes are securities under the NCSA, Plaintiffs' claim that Sturrus, Gallatin, and Aimet violated the NCSA through the unlawful solicitation and sale of unregistered securities also must survive. Accordingly, Defendants' motion to dismiss Plaintiffs' fourth claim for relief (Ver. Compl. ¶¶ 135—42) should be DENIED.

D.    *Fraud*

49.     Defendants seek dismissal of Plaintiffs' claims for fraud in violation of G.S. § 78A-56(1),[7] and common law fraud. (Ver. Compl. ¶¶ 120–32, 133–34.) Plaintiffs allege that Sturrus fraudulently represented that Gallatin would make its full $375,000 capital contribution to Aimet, at the same time SAW made its capital contribution. Plaintiffs allege that Sturrus represented that Gallatin would make the full contribution by October 31, 2015, to induce Wordsworth's execution of the Amended Note. Defendants contend that Plaintiffs have not alleged fraud with the particularity as required by Rule 9(b), that Sturrus's representations were statements of future intent and cannot be the basis of a fraud claim, and that Plaintiffs could not reasonably have relied on Sturrus' statements in executing the Notes because Plaintiffs were members of Aimet and had access to Aimet's books and records. (Defs.' Mem. Supp. Mot. Dismiss 17—21.)

50.     An action under G.S. § 78A-56(1) "sounds in fraud, comparable to common law fraud" and "must include allegations and proof typical of common law fraud claims." *Highwoods Realty Ltd.*, 2013 NCBC LEXIS 11 at **29, 30. The elements of a claim under G.S. § 56(a)(1) "closely parallel[] the Rule 10b-5 antifraud

---

[7] Although Plaintiffs titled this claim "Violation of N.C. Gen. Stat. § 78A-56(2),"they appear to have intended to invoke G.S. § 78A-56(1), alleging that "Sturrus, Aimet, and Gallatin . . . employed a device, scheme, or artifice to defraud SAW and Wordsworth and induced them to purchase equity securities and the Debt Securities, respectively"; that Sturrus's statements were known to be false and intended to deceive Plaintiffs; and the statements were "relied upon" by Wordsworth (Ver. Compl. ¶¶ 121, 122, 127); *Stanback v. Stanback*, 297 N.C. 181, 202, 254 S.E.2d 611, 625 (1979) ("when the allegations in the complaint give sufficient notice of the wrong complained of an incorrect choice of legal theory should not result in dismissal of the claim if the allegations are sufficient to state a claim under some legal theory"); *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 32 N.C. App. 400, 407–08, 232 S.E.2d 846, 852 (1977), *aff'd*, 294 N.C. 73, 240 S.E.2d 345 (1978) (holding that a court may grant any relief to which a party is entitled, regardless of whether it has been demanded in the pleadings, for "it is not a crucial error to demand the wrong relief").

provision of the Securities Exchange Act." *Id.* at \*33. "[T]he elements of a cause of action under Rule 10b-5 include: (1) the making of a false statement or omission of material fact or the use of a fraudulent device in connection with the purchase or sale of any security; (2) made with scienter; (3) upon which the purchaser justifiably relies; and (4) proximate causation." *Id.*; *see also Piazza v. Kirkbride*, 785 S.E.2d at 709, 2016 N.C. App. LEXIS 371, at \*38–39.

51.     Under North Carolina common law, "[t]o state a claim for fraud, the complainant must allege with particularity: (1) that defendant made a false representation or concealment of a material fact; (2) that the representation or concealment was reasonably calculated to deceive plaintiff; (3) that defendant intended to deceive plaintiff; (4) that plaintiff was deceived; and (5) that plaintiff suffered damage resulting from defendant's misrepresentation or concealment." *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 610, 486 S.E.2d 443, 447 (1997).

52.     A claim under G.S. § 78A-56(1), like common law fraud, must be alleged with particularity as required by Rule 9(b). *Highwoods Realty Ltd.*, 2013 NCBC LEXIS 11 at \*35. The particularity requirement is "met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981). "Malice, intent, knowledge, and other condition of mind . . . may be averred generally." G.S. § 1A-1, Rule 9(b).

53.     As a preliminary matter, Plaintiffs do not allege or argue that Sturrus or anyone else made false representations or omissions in inducing Wordsworth to provide the Demand Note. To the contrary, Wordsworth provided the Demand Note despite being informed that Gallatin still had not made its full capital contribution to Aimet. (Ver. Compl. ¶¶ 88–94.) Accordingly, to the extent Plaintiffs claim that the Demand Note was induced by fraud, that claim should be dismissed.

54.     With regard to Plaintiffs' claims for fraud in inducing SAW's capital contribution in Aimet and Wordsworth's execution of the Amended Note, the Court concludes that Plaintiffs have alleged their claims for fraud with the required particularity to survive dismissal. Plaintiffs alleged that Sturrus made the false misrepresentations, the dates or approximate dates on which the misrepresentations were made, and the content of those misrepresentations. While Plaintiff did not allege the specific locations at which the misrepresentations were made, it can be implied that they were made in and around Eastern North Carolina. Finally, Plaintiffs allege that the misrepresentations induced SAW to make the equity investment in Aimet and induced Wordsworth to execute the Amended Note for Aimet's benefit.

55.     Defendants also argue that Sturrus never represented that Gallatin had made its full capital contribution but only that it *would* make the contribution, and, accordingly, "the 'false' statement related to Gallatin's future performance, not a then existing fact." (Defs.' Mem. Supp. Mot. Dismiss 19.) In connection with soliciting SAW's capital contribution to Aimet, however, Plaintiffs allege that Sturrus represented that Gallatin would make an "equal investment in Aimet on equal terms"

with SAW. (Ver. Compl. ¶ 40.) Plaintiffs further provide that Sturrus did not disclose "that Gallatin's purchase . . . would be delayed, would not be on a cash basis, or that Gallatin would receive its ownership interest or voting rights in Aimet without first paying the amount shown on the capital tables . . . [i]nstead all of Sturrus' communications and all documentation . . . reflected Gallatin's intent and obligation to purchase its equity securities from Aimet before or contemporaneously with its receipt of its ownership interest or voting interest in Aimet." (Ver. Compl. ¶¶ 46–47.) In addition, Plaintiffs allege the capital tables presented by Sturrus to Plaintiffs, including the final table in the Operating Agreement, indicated that Gallatin was making a cash contribution. (Ver. Compl. ¶¶ 44, 56–57.) These allegations sufficiently allege statements of existing fact, and not future intent, to survive dismissal at this stage of the litigation.

56. Even if Sturrus's representations were characterized as statements regarding future events, Plaintiffs have alleged that Sturrus made the statements knowing that they were false and with no intention that Gallatin would make its full capital contribution. (Ver. Compl. ¶¶ 122, 126—27.) "As a general rule, a mere promissory representation will not support an action for fraud. However, a promissory misrepresentation may constitute actual fraud if the misrepresentation is made with intent to deceive and with no intent to comply with the stated promise or representation." *Braun v. Glade Valley Sch., Inc.*, 77 N.C. App. 83, 87, 334 S.E.2d 404, 407 (1985) (citations omitted); *McKee v. James*, 2013 NCBC LEXIS 33, *26 (N.C.

Super. Ct. July 24, 2013). Plaintiffs' allegations regarding the misrepresentations would support a claim for fraud.

57. Defendants next argue that Plaintiffs could not reasonably have relied on representations that Sturrus made after SAW became a member of Aimet and Wordsworth became a member of Aimet's Board of Managers because Plaintiffs had access to Aimet's books and records and could have discovered that Gallatin had not made its full contribution. (Defs.' Mem. Supp. Mot. Dismiss 20–21.) This argument would only apply to Plaintiffs' fraud claim based on Wordsworth's execution of the Amended Note on October 30, 2015, and not the capital contribution to Aimet. Although Defendants make scant argument in support of this contention and cite to no authority, they apparently are relying on the principal that "when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999). Plaintiffs' allege Wordsworth executed the Amended Note on October 30, 2015, based on Sturrus's statement that Gallatin would make its full contribution by October 31, 2015. Wordsworth could not have discovered that Sturrus's representation was false by reviewing Aimet's books on or before October 30, 2015. Defendants' argument based on Plaintiffs' alleged lack of reasonable diligence must fail at this stage of the case.

58.     Based on the foregoing, the Court concludes that Defendants' Motion to Dismiss Plaintiff's claims for fraud in violation of the NCSA (Ver. Compl. ¶¶ 120–32) and common law fraud (Ver. Compl. ¶¶ 133–34) should be DENIED.

D.     *Vicarious Liability*

59.     Plaintiffs allege as a separate "claim" that Gallatin and Aimet should be vicariously liable for Sturrus's conduct. (Ver. Compl. ¶¶ 143–51.)[8] Under common law, "a principal will be liable for its agent's wrongful acts under the doctrine of *respondeat superior* when the agent's act (1) is expressly authorized by the principal; (2) is committed within the scope of the agent's employment and in the furtherance of the principal's business; or (3) is ratified by the principal." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 296, 603 S.E.2d 147, 157 (2004). Plaintiffs allege repeatedly that at all times Sturrus was acting as a partner and agent of Gallatin, and as an officer, employee, and agent of Aimet. (*See, e.g.*, Ver. Compl. ¶¶ 144–46.)

60.     Plaintiffs also allege that Gallatin is liable under G.S. § 78A-56(c), which imposes secondary liability on, *inter alia*, (1) persons who "control" a person found liable under G.S. §§ 78A-56(a) or (b), including "every partner, officer, or director of the person," and (2) those who "materially aid[] in the transaction giving rise to the liability." (Ver. Compl. ¶ 117.) Plaintiffs do not expressly allege that Gallatin or Aimet had "control" over, or provided any material aid, to Sturrus in soliciting the

---

[8] To the extent Plaintiffs allege common law vicarious liability against Gallatin and Aimet, such liability apples only to Plaintiffs' claim for common law fraud.  As discussed *infra*, the claims under the NCSA are controlled by the statutory requirements for imposing secondary liability. *See* G.S. § 78A-56(c). Plaintiffs do not argue that Gallatin and Aimet can be liable for violations of the NCSA under common law vicarious liability.

transactions with Plaintiffs. Plaintiffs, however, do allege that Sturrus was a principal in both Gallatin and Aimet; that both entities "knew of the false and/or misleading nature of Sturrus's actions, inactions, conduct, and representations"; and, both entities benefitted from and ratified Sturrus's actions. (Ver. Compl. ¶¶ 148, 150.) The Court, under a liberal construction, finds that the Verified Complaint "broadly but adequately alleges" that Gallatin and Aimet controlled Sturrus and "put Defendants on notice of Plaintiffs' claim for secondary liability" against them under § 78A-56(c). *Atkinson v. Lackey*, 2015 NCBC LEXIS 21, **27–28 (N.C. Super. Ct. Feb. 27, 2015).

61.     The Court concludes that Plaintiffs have sufficiently alleged grounds for imposing common law vicarious liability on Gallatin and Aimet on the claim for common law fraud, and for secondary liability against Gallatin and Aimet under G.S. § 78A-56(c). Defendants' Motion to Dismiss Plaintiffs' claims for vicarious liability against Gallatin and Aimet should be DENIED.

E.     *Partnership Liability*

62.     Plaintiffs also allege a claim for "partnership liability" against Alexander and Gallatin GP based on Sturrus's conduct. (Ver. Compl. ¶¶ 152–54.) "It is fundamental that '[e]very partner is an agent of the partnership for the purpose of its business,' and that a partnership is generally bound by acts of a partner done to further the business of the partnership." *Hedgecock Builders Supply Co. v. White*, 92 N.C. App. 535, 543, 375 S.E.2d 164, 170 (1989) (quoting G.S. §59-39(a)). Partnership liability may lie when (1) the partner was acting on behalf of the partnership and was

authorized to so act; or (2) the partners, with knowledge of the transaction, thereafter ratified the acts of their partner. *Id.* at 543–44, 375 S.E.2d 164, 170.

63. Plaintiffs allege that "Sturrus, Alexander, and [Gallatin GP], as partners of [Gallatin LP], are liable to SAW and to Wordsworth to the same extent as [Gallatin LP]." (Ver. Compl. ¶ 153.) Defendants make no substantial argument in support of dismissal of the allegations of partnership liability.

64. The Court finds it premature to determine whether Alexander and Gallatin GP are liable to the same extent as Sturrus under a theory of partnership liability. Defendants' Motion to Dismiss Plaintiffs' claim for partnership liability against Alexander and Gallatin GP should be DENIED.

THEREFORE, IT IS ORDERED that:

65. To the extent Plaintiffs allege claims for fraud in violation of the NCSA (Ver. Compl. ¶¶ 120–32) and common law fraud (Ver. Compl. ¶¶ 133–34) based on Wordsworth's execution of the Demand Note, Defendants' Motion to Dismiss is GRANTED.

66. Except to the extent granted herein, Defendants' Motion to Dismiss Plaintiffs' Verified Complaint is DENIED.

This the 25th day of August, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
  for Complex Business Cases